# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **CARLOS BATTLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:11-CV-2658-VEH** |
| | ) | |
| **JOHN M. McHUGH, Secretary,** | ) | |
| **Department of the Army,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

THIS CAUSE is before the court on the Defendant's Motion to Dismiss and for Summary Judgment (the "Motion") (Doc. 21), filed on November 20, 2012.  Plaintiff responded on December 28, 2012.  (Doc. 25.)   Defendant replied on January 11, 2013.[1]  (Doc. 31.)  The Motion is now ripe for disposition.

## I.    FACTS

Plaintiff Carlos Battle ("Battle") alleges that the Defendant, the Department of the Army (the "Army"), discriminated against him because of his race, and retaliated against him for opposing its discrimination.  The alleged discrimination and retaliation

---

[1] Defendant also moved to strike Plaintiff's evidence submitted in opposition to the Motion. (Doc. 33.)  Plaintiff did not respond to this motion.  The court granted Defendant's motion to strike by separate order entered contemporaneously herewith.  (Doc. 35.)

occurred during and after Battle's month long deployment to Iraq in early 2008. Because of the conduct and the number of actors involved, the facts are complicated. To make matters worse, the parties dispute many of the background facts even though several of these disputes are not genuine. With these warnings in mind, the court will set forth the summary judgment facts.[2] The court states all facts in the light most favorable to Battle and draws all reasonable inferences in his favor. *See Optimun Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F. 3d 1231, 1241 (11th Cir. 2007).

Battle, an African-American, worked as a civilian mechanic at the Anniston Army Depot ("ANAD"). Battle worked on M1 tanks and other vehicles. (Doc. 25 at 5–6, ¶ 68; Doc. 23-1 at 10–11.) In 2008, at Battle's request, the Army sent him to Iraq with a team from the ANAD. Battle's team was tasked with installing new armor and equipment on M1 tanks. The team consisted of seventeen ANAD employees. Ten were mechanics like Battle. Of those ten, three were African-American and seven were Caucasian. (Doc. 22 at 7, ¶ 9–11.) The three African-American mechanics were Battle, Willie Swain ("Swain"), and Charles Godfrey ("Godfrey"). While some team

_____

[2] Battle failed to respond to the Army's Statement of Undisputed Facts ¶ 67–96. Under this court's Uniform Initial Order, these facts are deemed admitted for purposes of summary judgment. (Doc. 3 at 17, ¶ 2.a.) ("All material facts set forth in the statement required of the moving party will be deemed admitted or summary judgment purposes unless controverted by the response of the party opposing summary judgment.")

members received a temporary promotion while deployed, Battle was ineligible for a promotion.  (Doc. 22 at 16, ¶¶ 67–72.)

Battle's first line supervisor in Iraq was Doug Turner ("Turner"), a Caucasian and a civilian.  (Doc. 22 at 6, ¶ 3.)  The Army officer overseeing the ANAD team in Iraq was Major David Centeno ("Centeno"), a Latino.  (Doc. 22 at 6, ¶ 4.)  It appears that Turner regularly conferred with Centeno, but that Centeno was not in Turner's direct chain of command.  Instead, Turner reported to Thomas Carlisle ("Carlisle"), a Caucasian and a civilian employee with the ANAD.  At all relevant times, Carlisle worked from Alabama.

Battle and the ANAD team departed Alabama in January 2008.  They traveled to Kuwait first, and arrived in Iraq on January 21, 2008.  (Doc. 25 at 6, ¶ 72.)

Upon their arrival, Turner assigned roommates. (Doc. 23-1 at 13.)  He put Battle and Swain together, even though Battle was sitting in the front of the bus and Swain was sitting in the back.  (*Id.*)

Before beginning their mission, the ANAD team members underwent training regarding the installation of the new armor and equipment.  Turner told the mechanics to go with one of two instructors for this training.  (Doc. 25 at 7, ¶ 79.)  It is undisputed that all three black mechanics went with the same instructor.  (Doc. 25 at 8, ¶ 80.)  However, it is not seriously disputed that each mechanic chose the instructor he or she

3

would train under.  (Doc. 23-1 at 20.)  The training lasted about two weeks.  (Doc. 25 at 7, ¶ 82.)

After their training, the ANAD team began installing the new armor and equipment.   The mechanics' job consisted of adding skirts around the outside of the tanks, working on the copula, installing grenade launders, and working on the seats.  (Doc. 25 at 8, ¶ 85.)  Battle, Swain, Godfrey, and two Caucasian mechanics, Wesley Walker ("Walker") and Rosawitha Morris ("Morris"), worked on the skirts.  (Doc. 25 at 8, ¶ 88.)  Installing the heavy skirts required a forklift.  (Doc. 25 at 9, ¶ 96.) Because the ANAD mechanics had to share the forklift with other teams and each other, they sometimes had to wait on the forklift before they could install a skirt.  (*Id.*)  Battle contends that Turner would constantly scold him, Swain, and Morris for not working while they waited on the forklift.  (Doc. 25 at 10, ¶ 104.)  Battle admits that he did nothing while waiting on the forklift.  (Doc. 25 at 10, ¶ 100.)  However, he contends that there was nothing for him to do.

Around the time the team began working, Turner assigned Joseph Rakestraw ("Rakestraw"), a Caucasian mechanic, the duties of quality assurance inspector.  (Doc. 22 at 15, ¶ 62.)   These duties required Rakestraw to inspect each tank after the mechanics completed their work.  Rakestraw received no additional pay or benefits for these duties.  (Doc. 23-4 at 8.)  Before Turner assigned these duties to Rakestraw,

4

Battle asked to be the quality assurance inspector.  Turner never asked Battle about his qualifications before making his decision.

Battle contends he was better qualified than Rakestraw.  The Army disputes Battle's contention.  The Army admits that Battle had some experience with the M1.  But, the Army points out that Battle also worked on other vehicles, yet treats this experience as equally applicable to the M1.[3]  (Doc. 31 at 3, ¶¶ 70–71; Doc. 23-1 at 11.)  Even giving Battle the benefit of the doubt, Battle has not shown that he was *more* qualified than Rakestraw.[4]  And, because any further comparison is unnecessary to resolve the Motion, the court will simply assume, for purposes of summary judgment, that both men were equally qualified on the M1.

Battle contends that the assignment of the quality assurance inspector duties to Rakestraw is just one example of how white employees received better treatment from Turner.  Battle also contends that Turner never reprimanded white employees for doing

_____

[3]  For example, Battle testified that he worked on small parts, suspension, wiring, putting on the nose, and driving the tank.  However, Battle was referring to the M-113, not the M1.  (Doc. 23-1 at 11.)

[4]  Rakestraw served as an M1 crewman while enlisted.  During that time, he trained on all aspects of the M1 tank including the track, suspension, the turret, as well as the operation and repair of the tank. (Doc. 22 at 16, ¶ 65.)  Additionally, Rakestraw worked on M1 engines and guns at the ANAD, and had a track vehicle driver's license.  (Doc. 22 at 16, ¶ 64.)
Battle's experience included putting the skirts and copulas on the tanks, retracking them, and test driving them.  Battle also performed all the work done in Building 177.  It is unclear what exactly happened in this building, but even assuming it included all the things Rakestraw was trained on, Battle's testimony only establishes that, at best, his experience was similar to Rakestraw's.

nothing while waiting on the forklift, (Doc. 23-1 at 30–31); that Turner allowed white employees to use the computer in his office, (Doc. 23-17 at 24); and that white employees left work early to go shopping, (Doc. 23-10 at 111–12).

The shopping allegation misstates the record. To support his shopping allegation, Battle relies on Morris's testimony at his EEO hearing. Yet, Morris testified that the <u>welders</u>, who were all Caucasian, got to leave early. Morris did not say that the white <u>mechanics</u> got to leave early. In fact, Morris was a white mechanic, and she was required to stay and work. Thus, the record shows only that the welders, who all are Caucasian, were allowed to leave work early.

When the ANAD team began working, Centeno would walk around and observe their progress. Centeno saw Battle's poor effort and talked to Turner about it.[5] (Doc. 22 at 9, ¶ 20.) In fact, Centeno advised Turner to counsel Battle about his "lack of productivity" and to "take corrective action, if required." (Doc. 22 at 9, ¶ 24; Doc. 23-5 at 2, ¶ 7–11.) Other ANAD team members, including Godfrey (an African American) also complained about Battle's work ethic.[6]

---

[5] Battle disputes Centeno's characterization of his work performance. However, Battle cannot, and in fact does not, dispute that Centeno complained to Turner. (Doc. 25 at 3, ¶ 20.) Furthermore, Battle admits that Centeno never discriminated against him. (Doc. 22 at 12, ¶ 38.)

[6] Turner testified that other employees complained about Battle's work ethic. (Doc. 22 at 9, ¶ 21; Doc. 23-4 at 13.) Battle disputes that other employees complained about his work. However, Battle provides no citation for his dispute. (Doc. 25 at 3, ¶ 21–22.) In fact, several ANAD team members later provided written statements saying that Battle did not work hard in Iraq.

On February 4, 2008, Carlisle instructed Turner to counsel Battle about his work. (Doc. 22 at 10, ¶ 27.)  Turner counseled Battle on February 6, 2008.  (Doc. 22 at 10, ¶ 29.)  During the counseling, Battle accused Turner of racism and stormed out of the room.  (Doc. 22 at 10, ¶ 30.)

That same day, Battle went to Centeno and said that Turner was discriminating against him.  (Doc. 22 at 11, ¶ 31.)[7]  Centeno called a meeting and advised everyone that he would have "zero tolerance" for discrimination.  (Doc. 22 at 11, ¶ 32.)

Battle drinks coffee.  The mechanics had a designated coffee station.  But the coffee was not always made there, and the station lacked creamer.  So, Battle would go to Centeno's office twice a day to get coffee.  This station always had coffee and cream.  (Doc. 25 at 11, ¶ 109; Doc. 23-1 at 20.)  While in Centeno's office, Battle would speak to Bridgette Kinchen, one of Centeno's secretaries.  (Doc. 22 at 13, ¶ 49.)  Eventually, Centeno instructed Turner to tell Battle to stay out of his office.  (Doc. 22 at 13, ¶ 51.)  It is unclear when Turner told Battle to stay out of the office.  But, Battle contends that Turner allowed white employees to get coffee from Centeno's office.

---

(Doc. 23-18 at 25–30; Doc. 23-19 at 1–9.)  While these after-the-fact statements do not confirm Turner's testimony, they certainly lend it strong support.  And, because Battle provides no evidentiary support for his dispute with Turner's testimony, Battle failed to comply with this court's Uniform Initial Order.  (Doc. 3 at 17, ¶ 2.a.)  Thus, Battle's dispute is not genuine for purposes of summary judgment.

[7]  It is unclear whether Battle discussed the alleged used of the racial slur "DAN" by ANAD employees during this meeting.

(Doc. 23-1 at 19.)

The night of February 13, 2008, a heavy tile fell on Battle's leg. (Doc. 23-1 at 33.) Swain witnessed the incident, and said, "Man, you alright? Man, I know that hurt. Don't try to be playing it off." (Doc. 23-10 at 1.) Battle responded, "Yeah. I'm all right. I'm all right." (*Id.*) The tile scratched Battle's leg and caused it to swell. Battle initially did nothing, but, at the end of his shift, he showed Turner his leg. (*Id.*) Battle said, "I need some help," "my leg is hurting bad," and "I need someone to look at my leg." (Doc. 23-1 at 33.) At that point, Battle's leg was swollen and scratched.[8] (Doc. 23-1 at 33.) Turner told Battle he would be alright and to go back to his room. Battle never asked Turner for pain medication. (Doc. 23-10 at 3.)

The next morning, Battle showed Turner his leg again. Battle said, "Doug, my leg is still swollen." (Doc. 23-1 at 34.) It is unclear just how swollen Battle's leg was that next morning. Battle testified that it was so swollen he could not tie his boot. (Doc. 23-10 at 2.) However, a little while later when he showed his leg to Turner, the swelling had gone down. (*Id.*) Moreover, Battle testified that he continued working on the skirts despite his injury. (Doc. 23-1 at 34.)

On February 14, 2008, a tank skirt fell on Walker's toe. Immediately, Walker

---

[8] The court recognizes that Battle has given conflicting reports about his injury. These inconsistencies go to the credibility of his testimony, which is a jury question.

"came out from under the vehicle and threw his glasses from the extreme pain." (Doc. 23-2 at 7.) Battle and Swain witnessed Walker's injury, and Battle removed Walker's shoe. His toe was "red," swelling, and turning blue. (Doc. 23-1 at 33; Doc. 23-2 at 7.) Battle and Swain went and got Turner and told him about Walker's injury. After looking at Walker's toe and hearing what happened, Turner sent Walker to the infirmary. Only then did Battle learn that the infirmary even existed. Despite this knowledge, Battle never went to the infirmary on his own and never received medical treatment for his leg while in Iraq. (Doc. 23-1 at 34.)

At some point after the team arrived in Iraq, Rakestraw began calling Battle "DAN" to his face. (Doc. 23-1 at 28.) Rakestraw used this word several times, but Battle does not remember how many. Battle initially thought this term was cool and did not infer any ill intent. However, Kinchen later told Battle that DAN stands for "Dumb Ass Nigger." (Doc. 23-1 at 28.)

After that, Rakestraw called Battle DAN only one more time. (Doc. 23-1 at 28.) On February 17, 2008, Rakestraw approached Battle and said, "Hey, DAN, you ain't working—you ain't working fast enough. You're going to have to get—you're going to have to get this job done." (Doc. 23-1 at 28.) Battle confronted Rakestraw, and the two men got into an argument. (Doc. 23-1 at 28.) Rakestraw immediately told Turner about their argument. Turner then told Battle that he was going home. (Doc. 23-1 at

9

28.)

It is undisputed that Battle left Iraq on February 24, 2008.  (Doc. 22 at 7, ¶ 9.)
It is further undisputed that Turner accused Battle of conduct unbecoming a federal
employee.  (Doc. 23-8 at 29.)

Two other employees, Swain and Morris, also came home at the same time as
Battle.  Swain was also brought home for conduct unbecoming a federal employee.
The record contains conflicting statements about why Morris came home early.  Even
Battle's position on why Morris came home early is not consistent.  At one point,
Battle contends that Morris came home early because she had a problem with Turner.
(Doc. 25 at 4, ¶ 43–45; Doc. 23-10 at 129.)  At another point, Battle contends that
Morris came home early for conduct unbecoming a federal employee.  (Doc. 25 at
19–20, ¶ 171, 174–76.)  In any event, it is undisputed that an email from Turner to
Carlisle on February 20, 2008, shows that Swain, Battle, and Morris all came home for
conduct unbecoming a federal employee.  However, Battle also admits that Carlisle
never received any complaints about Morris's performance from Centeno or an ANAD
team members.  (Doc. 22 at 13, ¶ 46–47.)

Turner recommended that the Army discipline Battle for his conduct in Iraq.
(Doc. 22 at 19, ¶ 86.)  However, Turner never disciplined Battle himself.  And, it is

undisputed that Michael Burke, a Caucasian, made the decision to suspend Battle.[9] (Doc. 23-7 at 1–2, ¶ 4, 6.)  Burke proposed that the Army suspend Battle for sixty (60) days.  (Doc. 23-18 at 5–6.)  The Army offered Battle an Alternate to Traditional Discipline, which would have reduced his suspension to thirty (30) days.  He refused. (Doc. 22 at 20, ¶ 88.)  Nonetheless, Burke reduced Battle's suspension to forty (40) days.  Burke imposed Battle's suspension in October 2008.  (Doc. 22 at 19, ¶ 87.)

Perhaps ironically, Turner and Rakestraw were later charged with conduct unbecoming a federal employee.  After Battle left Iraq, Rakestraw got drunk and called another employee a "nigger." (Doc. 23-4 at 11.)  For his conduct, Rakestraw received a thirty (30) day suspension after he accepted the Alternate to Traditional Discipline. (Doc. 22 at 20, ¶ 93.)  Turner failed to delete and then forwarded offensive emails. (Doc. 23-8 at 7–8, ¶ 29.)  For his conduct, Turner was demoted.  (Doc. 22 at 20, ¶ 89.)

Meanwhile, Battle contacted an EEO counselor and filed a formal complaint on May 1, 2008.  An EEO investigator conducted a hearing in October 2008.  A transcript of this hearing is part of the record.  (Docs. 23-9, 23-10, 23-11 & 23-12.)  Battle filed

---

[9] Battle contends that Burke made his decision based on information received from Carlisle and Turner.  Battle's contention is not supported by the record.  Burke asserts he reviewed Battle's adverse action file, and based his decision on the file.  The file contains numerous statements from other ANAD employees which allege that Battle was lazy and a constant distraction to their mission. (Doc. 23-18 at 25–30; Doc. 23-19 at 1–8.)

this action on July 25, 2011.  (Doc. 1.)

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(a).  "All reasonable doubts about the facts" and "all justifiable inferences" are resolved in favor of the nonmoving party.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).[10]  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  The substantive law will identify which facts are material and which are irrelevant.  *Id.*

The summary judgment analysis varies somewhat depending on which party bears the burden of proof at trial.  *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).

---

[10] Rule 56 was amended in 2010. The Advisory Committee was careful to note, however, that "[t]he standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments.  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

If the moving party would bear the burden of proof on an issue, then it may meet its burden on summary judgment only by presenting positive evidence demonstrating an absence of a genuine issue of material fact—i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Id.* at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial. *Id.*

If the nonmoving party would bear the burden of proof on an issue at trial, then the moving party can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115–16. First, the moving party may produce affirmative evidence negating a material fact, thereby demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 1116. If the moving party produces such evidence, then the nonmoving party must respond with positive evidence sufficient to defeat a motion for a directed verdict at trial. *Id.*

Second, the moving party may affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on a material element. *Id.* The moving party is not required to produce evidence negating its opponent's claim, but it must direct the court to the hole in the nonmoving party's case. *Id.* at 1115–16. If the moving party satisfies this burden, the nonmoving party may either point to evidence in the record which would sustain a judgment at trial, or may also come forward with

additional evidence which would sustain a judgment. *Id.* at 1116–17. The nonmoving party cannot simply rest on mere allegations; he must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136–37 (1992)).

### B. *McDonnell Douglas* Burden Shifting Framework, Generally

A plaintiff may show unlawful discrimination under Title VII in "three ways: [1] by presenting direct evidence of discriminatory intent; [2] by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973); or [3] by demonstrating through statistics a pattern of discrimination." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). The second method, the now familiar *McDonnell Douglas* burden shifting framework, is particularly relevant here. The court will introduce it by quoting the Eleventh Circuit:

> Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination, which "in effect creates a presumption that the employer unlawfully discriminated against the employee." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). [The precise elements of a prima facie case vary depending on the type of discrimination alleged.]
>
> Once the plaintiff establishes a prima facie case of [unlawful] discrimination, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802–03, 93 S. Ct. 1817. "This burden is one of production, not persuasion . . . ." Reeves, 530 U.S. at 142, 120 S. Ct. 2097. Thus, "[t]o satisfy that burden of production, '[t]he defendant need not persuade the

court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir.1997) (quoting Burdine, 450 U.S. at 254–55, 101 S. Ct. 1089). If the employer produces evidence of a legitimate, nondiscriminatory reason for the adverse action, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination. See, e.g., Reeves, 530 U.S. at 143, 120 S. Ct. 2097; McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. 1817.

The plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S. Ct. 1089. "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs, 106 F.3d at 1528. If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer. See Reeves, 530 U.S. at 148, 120 S. Ct. 2097. See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308–09 (11th Cir. 2012) (footnote omitted).

"The prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical

question of discrimination." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S.

711, 715, 103 S. Ct. 1478, 1482 (1983) (internal quotation marks and citation omitted);

*see Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

## III.   ANALYSIS

Battle alleges that the Army discriminated against him because of his race, and

retaliated against him for opposing its unlawful conduct.   Battle's Complaint alleges

five counts: (1) Race Discrimination—Disparate Treatment; (2) Discriminatory

Discharge; (3) Retaliation; (4) § 1983; and (5) Race Discrimination—Hostile Work

Environment.  (Doc. 1.)  Battle now concedes that Counts Two and Four are due to be

dismissed.   (Doc. 25 at 22.)   Thus, the Motion is **GRANTED** on these counts.

However, Battle contends that his claims for disparate treatment, a hostile work

environment, and retaliation must go to a jury.   (*Id.*)   The court will address each in

turn.

### A.    Disparate Treatment

Battle contends the Army treated him worse than white employees because of

his race.   Battle offers no direct evidence of discrimination.   Instead, he relies on the

*McDonnell Douglas* burden shifting framework.   To establish a prima facie case of

disparate treatment based on race, "a plaintiff must generally show that (1) [he] is a

member of a protected class; (2) [he] suffered an adverse employment action; (3) the

16

employer treated similarly situated employees outside of the protected class more favorably; and (4) [he] was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (citation omitted).

An adverse employment action is one which "in some substantial way, alter[s] the employee's compensation, terms, conditions, or privileges of employment, deprive[s] . . . [him] of employment opportunities, or adversely affect[s] . . . [his] status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (internal quotation marks and citations omitted). "[N]ot everything that makes an employee unhappy is an actionable adverse action . . . ." *Bass v. Bd. of Cnty. Comm'rs,* 256 F.3d 1095, 1118 (11th Cir.2001) (citation omitted) (internal quotation marks omitted).

Employees are similarly situated when they do the same thing but are treated differently. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). The employees must be in substantially the same position, or, as the Eleventh Circuit has said, similar "in all *relevant* respects." *Id.* (emphasis added). The burden is on the plaintiff to show that employees are similar. *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989). The defendant has no burden to show that the employees are dissimilar. *Id.*

In his Response, Battle treats several acts as a single adverse employment action. (Doc. 25 at 24–27.) However, for purposes of Battle's disparate treatment claim, he

cannot simply lump several unfavorable acts together.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111–12, 122 S. Ct. 2061, 2071 (2002) (holding that a court must analyze discrete actions separately to determine if they are timely under Title VII). Instead, Battle must separately challenge each adverse action.  *See id.*  Only then can the court analyze whether unlawful discrimination motivated the adverse action.  *Cf. id.*

In this case, Battle contends that Turner (1) put him in segregated housing and training, (2) reprimanded him for going to Centeno's office to get coffee and for talking on a cell phone, and (3) scolded him for not being productive.  These acts are not adverse employment actions because they did not materially affect the terms and conditions of Battle's employment.[11]

Battle also contends that (1) he was not assigned the quality assurance inspector duties, (2) he was denied medical attention after an injury, (3) he was sent home early from Iraq, and (4) he was suspended for forty days without pay.  These are distinct acts which could have potentially affected the terms and conditions of Battle's employment. The court will analyze each in turn.

### 1.    Denial of Quality Assurance Inspector Duties

Battle contends that Turner discriminated against him by assigning the quality

---

[11]  The court will analyze these actions under Battle's hostile work environment claim.

assurance inspector duties to Rakestraw.  But, Battle has not shown that this act was an adverse employment action.  Battle admits that Rakestraw received no additional pay or benefits for performing these duties.  (Doc. 22 at 15, ¶ 63; Doc. 23-2 at 3, ¶ 11.)  Nor has Battle shown that these duties afforded Rakestraw significant prestige, an opportunity for advancement, or any other appreciable benefit.  Therefore, Battle has not shown that Rakestraw's selection for this position was an adverse employment action.

And, even assuming this decision was an adverse employment action, and assuming that Battle has a prima facie case, Battle has not shown pretext.  The Army contends that Turner selected Rakestraw based on his overall experience with the M1 tank.   (*See* Doc. 23-2 at 3, ¶ 11; Doc. 22 at 16, ¶ 64.)  Thus, to show pretext, Battle must show that "the disparities between [Rakestraw's qualifications] and [Battle's] qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Rakestraw] over [Battle]." *See Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (citing *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004)) (internal quotation marks omitted).   Yet, a comparison of Battle's qualifications and Rakestraw's qualifications show that both men were equally qualified on the M1.  (Doc. 22 at 16, ¶ 64, 66.)  Thus, Battle has not shown that any reasonable person

19

would have chosen him over Rakestraw.

The Motion is due to be **GRANTED** on Battle's disparate treatment claim related to the quality assurance inspector duties.

## 2. Denial of Medical Treatment

Battle has not established a prima facie case of disparate treatment related to his alleged injury because he has not shown that a similarly situated white employee received better treatment. Battle contends that Turner sent Walker to the infirmary for his toe, but did nothing for his injured leg. Though Walker's injury may appear similar to Battle's alleged injury, they are not the same.

A tank skirt fell on Walker's toe. Immediately, Walker "came out from under the vehicle throwing his glasses from the extreme pain." (Doc. 23-2 at 7.) Walker's toe was "red," swelling, and turning blue. (Doc. 23-1 at 33; Doc. 23-2 at 7.) Battle, Swain, and Walker all informed Turner about the injury. Turner then sent Walker to the infirmary. (Doc. 23-2 at 7.)

Conversely, a heavy tile fell and hit Battle's left leg. Swain asked Battle if he was alright, and he said that he was. Battle completed his shift before showing Turner his injury. (Doc. 23-1 at 33.) Battle said, "Hey, Doug, a tile fell on my leg," and "[i]t's getting swole up right now." (Doc. 23-1 at 33.) Battle also asked Turner for medical treatment. Battle showed Turner his leg, which was scratched and swollen.

(*Id.*) Turner told him not to worry about it. The next morning, Battle's leg was still swollen, though the swelling had gone down some. He showed his leg to Turner, who again said it would be alright. Battle never asked Turner to go to the infirmary and never asked him for pain medication. (Doc. 23-1 at 33; Doc. 23-10 at 3.)

These incidents differ for several reasons. First, Walker's injury prompted an immediate response from his coworkers. In fact, Battle was one of the two employees who went to get help for Walker.[12] Conversely, none of Battle's coworkers sought help for him. In fact, Swain asked Battle if he was alright, and Battle said that he was. Swain did not go for help. Second, Walker's injury caused immediate and disabling pain as evidenced by Battle's report of the incident. (Doc. 23-2 at 7.) Conversely, Battle's injury did not cause immediate pain, and in fact, Battle finished his shift before ever seeking medical assistance. Third, it was readily apparent that the skirt had crushed Walker's toe. The toe looked red, was turning blue, and was swelling. Meanwhile, Battle's injury was not so clear cut. Though Battle's leg was scratched and swollen, a reasonable person would not necessarily conclude that a falling tile, which only scratched a person's leg, would cause a serious injury. Additionally, Battle's own testimony shows that his leg looked better the next morning, even though

---

[12] Based on Battle's version of events, his leg was injured when he went to get help for Walker.

it was still swollen.  Finally, Battle himself said that he was alright after his injury.

(Doc. 23-10 at 1.)  Given these differences (and the general difficulty in diagnosing

injuries), Battle has not shown that he was similarly situated to Walker.

Independently and alternatively, Battle has not shown that Turner's decision affected

the terms and conditions of his employment.   The court assumes that Battle's job

affords him medical treatment for work related injuries.  And, Battle clearly asked

Turner for medical attention.  However, Battle has not shown that Turner denied him

*needed* medical treatment.

First, even though Battle asked Turner for help, Battle has not shown that Turner

must have recognized the seriousness of his injury.  Turner was certainly not required

to credit Battle's self-assessment.  Battle's leg was scratched and swollen, but common

sense teaches that scratches and swelling do not necessarily require professional

medical attention.  Further, it is undisputed that Battle never asked Turner for pain

medication, and that Battle continued to work despite his alleged injury.  Thus, Battle

has not shown that Turner's decision was unreasonable.

Battle contends that Turner still should have sent him to the infirmary.  Again,

Battle has not shown that Turner was required to do so.  Nor has Battle shown that

Turner prohibited him from going, or otherwise prevented him from obtaining medical

treatment.   On this record, the only reasonable conclusion is that Turner decided that

Battle's injury was not serious enough to warrant sending him to the infirmary. Battle has produced no policy, procedure, or practice which required Turner to send him to the infirmary. While Battle asked for medical attention, Battle never asked to go to the infirmary. Battle contends he never asked because he did not know the infirmary existed. (Doc. 23-1 at 33.) Yet, Battle's lack of knowledge does not show that Turner concealed the infirmary's existence. Battle could have asked for Turner to send him to someone else for help. He did not. Therefore, Battle has not shown that Turner prevented him from obtaining medical treatment.

Finally, Battle has not even shown that he needed medical treatment for his leg. Battle has produced no evidence, other than his own testimony, which shows that he needed medical treatment on the night of February 13. And, it is undisputed that Battle never went to the infirmary on his own even after he learned of its existence. (Doc. 23-1 at 33–35.)

For these reasons, Battle has not shown that Turner's conduct adversely affected the terms and conditions of his employment. Battle may be unhappy with the way Turner handled his injury, but his displeasure does not transform Turner's actions into a violation of Title VII.

Because Battle failed to establish a prima facie case of discrimination related to his injury, the Motion is due to be **GRANTED** on this claim.

23

3.   The End of Battle's Deployment

Regarding his early return from Iraq, Battle has not shown that his return adversely affected the terms and conditions of his employment.  Battle contends that he lost the opportunity to earn more money when he was sent home early.  Yet, Battle has admitted that he was ineligible for a promotion while deployed to Iraq.  (Doc. 22 at 71, ¶ 68–71.)[13]  Moreover, Battle does not contend that his early return otherwise affected the terms of his employment.  Thus, he cannot establish this element of his prima facie case.[14]

Independently and alternatively, Battle has not shown that the Army treated a nonprotected, similarly situated employee more favorably.  In the disciplinary context, "the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008) (citation omitted).  Indeed, "[t]he standard for similar conduct is a fairly rigorous one."  *Id.*

---

[13]  The Army asserts that Battle was ineligible for promotion while deployed to Iraq.  (Doc. 22 at 17, ¶ 71.)  Battle did not respond to this allegation, and it is supported by the Army's cited evidence.  (Doc. 23-8 at 2, ¶ 7.)  Therefore, Battle has admitted that he was ineligible to earn more money while in Iraq.  (*See also* Doc. 3 at 17)

[14]  To be clear, Battle's early return from Iraq is distinct from his suspension without pay.

Here, Carlisle says he received complaints about Battle's work performance from Centeno. (Doc. 23-8 at 7, ¶ 25.) In fact, in its Statement of Undisputed Facts, the Army asserts that "Centeno requested Turner to send Battle home based on his poor work performance, failure to improve, his poor attitude, and his negative impact on team morale." (Doc. 22 at 11, ¶ 37.) Carlisle's declaration supports the Army's allegation, (Doc. 23-8 at 7, ¶ 25), as does Centeno's sworn testimony from the EEO inquiry (Doc. 23-11 at 7–8) and his declaration in this case (Doc. 23-5 at 2, ¶ 6–11).

In his Response, Battle disputes that Centeno complained about his work. However, Battle cites no evidence to support his dispute. Instead, Battle's Response generally contends that he worked hard in Iraq. (Doc. 25 at 4, ¶ 34–37.) Thus, the court must conclude that Battle cannot genuinely dispute that Centeno complained about his work. Further, Battle admits that Centeno never discriminated against him. (Doc. 22 at 12, ¶ 38; Doc. 23-1 at 12–13.) Finally, Battle has not identified a white employee that Centeno complained about and who was not sent home early. (Doc. 34 at 6, ¶ 11.) Because Battle has not shown a similarly situated employee outside the protected group was treated differently, he has not established a prima facie case.

And, even assuming that Battle could establish a prima facie case, he has not shown pretext. The Army contends that Carlisle decided to bring Battle home early because of Centeno's complaints. (Doc. 22 at 34.) As discussed above, Battle does

25

not seriously dispute that Centeno complained about his performance.   Therefore, Battle cannot show that the Army's articulated reason for his early return is false, much less a pretext for unlawful discrimination.

Thus, the Motion is due to be **GRANTED** on Battle's disparate treatment claim related to his early return from Iraq.

### 4.   Battle's Suspension without Pay

Battle's suspension without pay is clearly an adverse employment action. However, Battle has not shown that a similarly situated employee was treated more favorably.

Battle was disciplined for conduct unbecoming a federal employee.  (Doc. 22 at 19, ¶ 87.)  Both Rakestraw and Turner were also disciplined for conduct unbecoming a federal employee.  (Doc. 22 at 20, ¶ 89 & 93.)  Thus, Battle cannot seriously contend that Rakestraw or Turner received better treatment.  Nor has Battle identified any other similarly situated, nonprotected employee who was not disciplined.

The Army also contends that Morris is not a proper comparator.  Battle does not compare himself to Morris and, therefore, has waived this issue.  *See Cont'l Technical Serv., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991); *Rumph v. Astrue*, No. 4:11-CV-3844-VEH, 2013 WL 988006, at * 6 n.3 (N.D. Ala. Mar. 13, 2013) ("The court is not responsible for addressing underdeveloped arguments made

by the parties.").

But, even if Battle had made this argument, Morris is not similarly situated to Battle in all relevant respects.  It is undisputed that Centeno never complained about Morris and never asked for her to be sent home.  Nor has Battle shown that other ANAD employees complained about Morris's work.  (*See* Doc. 23-18 at 25–30; Doc. 23-19 at 1–8.)  Thus, Battle cannot make out a prima facie case of discrimination related to Morris.

And, even assuming that Battle could somehow establish a prima facie case of discrimination regarding his suspension, he cannot show pretext.  It is undisputed that Michael Burke made the decision to discipline Battle.  Battle contends that Burke relied exclusively on information received from Turner and relayed through Carlisle.  But, it is not seriously disputed that Burke based his decision on Battle's adverse action file.  The court has independently reviewed Battle's adverse action file and concludes that it contains ample, independent evidence (including complaints about Battle's work from Godfrey, an African-American mechanic) to support Burke's decision. (Doc. 22 at 34; Doc. 23-7 at 1–2, ¶ 4, 6; Doc. 23-18 at 5.)  Thus, Battle has not shown that unlawful discrimination caused his suspension.  (Docs. 23-17, 23-18 & 23-19.)

For these reasons, the Motion is due to be **GRANTED** on Battle's disparate treatment claim related to his suspension.

**B.     Hostile Work Environment**

Battle next contends that he endured a hostile work environment.  To succeed on a hostile work environment claim, an employee must show: "(1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of [his] employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted).

Title VII does "not prohibit [all] harassment [in the workplace] . . . .  Instead, Title VII prohibits . . . harassment that discriminates based on a protected category . . . ." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir. 2007).  If an employer harasses an employee for some other reason, it does not violate Title VII.  *See id.* at 1302.  Thus, an employee must show that race-neutral harassment occurred because of the employee's race.  *Id.*; *see also Jones*, 683 F.3d at 1297 ("[O]nly conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis. Innocuous statements or conduct, or boorish ones that do not relate to the race of the actor or of the offended party . . ., are not counted.") (internal quotation marks and citations omitted); *Mendoza v. Borden,*

*Inc.*, 195 F.3d 1238, 1254 n.3 (11th Cir. 1999) (Edmondson, J., concurring).   An employee can do this by showing that similarly situated employees not in the protected group were treated differently.  *See Baldwin*, 480 F.3d 1302 (citing *Mendoza*, 195 F.3d at 1254 n.3)

Additionally, an employee must show that the harassment was sufficiently severe and pervasive to alter the terms of his employment.   "[S]imple teasing, offhanded comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faraghar v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998).  To show severe and pervasive harassment, a plaintiff must show (1) he  subjectively perceived the harassment as severe and pervasive, and (2) his perceptions were objectively reasonable.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). Regarding the objectively reasonable prong, the court must consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *See id.*

In this case, Battle alleges numerous forms of harassment: (1) his coworkers frequently called him "DAN," which stands for "dumb ass nigger," (Doc. 23-9 at 48); (2) that Turner segregated him in his housing and training; (3) that Turner used the

29

word "nigger," though Battle never heard him use it, (Doc. 23-10 at 120); (4) that Battle was constantly scolded for not working hard; (5) that Battle was not allowed to go in Centeno's office to get coffee; (6) that white employees were allowed to use Turner's computer; (7) and that white employees were not scolded for doing nothing while waiting on the forklift.[15]

### 1.   Alleged Harassment Unrelated to Battle's Race

First, Battle has not shown that much of this alleged harassment has anything to do with his race.  According to Battle's own testimony, Turner scolded him, Swain, and Morris (a white employee) for not working while they waited on the forklift.  (Doc. 23-1 at 31.)  Because Turner scolded both white and black mechanics, Battle has not shown that Turner scolded him because of his race.  Furthermore, it is undisputed that Centeno complained to Turner about Battle's work.   And, other employees also complained about Battle's work.  Thus, no reasonable jury could conclude that Turner scolded Battle because of his race.

Regarding the coffee from Centeno's office, Battle admits that Centeno

---

[15]   Battle also contends that white employees were allowed to leave work early and go shopping. (Doc. 25 at 10, ¶ 103.) As explained in Section I, Battle's allegation mischaracterizes the record. The cited testimony shows that the welders were allowed to leave early and go shopping, but that the mechanics had to stay and work. (Doc. 23-10 at 111.)  The welders are different from the mechanics. And, Morris, who is a Caucasian mechanic, was not allowed to leave early. Thus, Battle has not shown disparate treatment.

instructed Turner to tell Battle to stay out of his office.  (Doc. 22 at 13, ¶ 51; Doc. 23-5 at 3, ¶ 11–12.)  Battle does not allege that Centeno discriminated against him.  Thus, no reasonable jury could conclude that this action had anything to do with Battle's race.

Battle contends that the white mechanics got to spend time in Turner's office playing on his computer.  (Doc. 23-1 at 19.)  Yet, Battle has not shown that he ever tried to use Turner's computer.  Thus, Battle has not shown disparate treatment.

Additionally, Battle contends that Turner did not scold white employees who did nothing while waiting on the forklift.  But Battle's own testimony undermines any inference of discrimination.  According to Battle, there were two teams who shared the forklift.  His team included a white employee—Morris—and the other team included a black employee—Godfrey.  (Doc. 23-1 at 31.)  Turner scolded Battle's team, but did not scold Godfrey's team.  Because the teams were racially mixed, a reasonable jury could not conclude that Turner's scolding of Battle's team had anything to do with his race.

Finally, the record contradicts Battle's allegation of segregated training.  Battle testified that the mechanics chose which instructor they would train with.  (*Id.*; Doc. 23-1 at 20.)  It just so happened that all three black mechanics chose the same instructor.  (Doc. 23-1 at 20.)  Thus, this allegation does not show disparate treatment.    Because

Battle cannot attribute the above alleged harassment to his race, the court will not consider these acts in deciding if Battle endured severe and pervasive harassment. *See Jones*, 683 F.3d at 1297.

### 2.   Alleged Race-Related Harassment

That leaves the use of the racial slur DAN, Battle's segregated housing, and Turner's alleged use of the N-word.  After careful consideration, the court concludes that this harassment was not sufficiently severe and pervasive to alter the terms and conditions of Battle's employment.

Regarding the use of DAN, Battle contends that Rakestraw called him DAN to his face on several occasions.  (Doc. 23-1 at 28.)  On these occasions, Battle did not know what DAN meant.  In fact, Battle thought DAN "was like man, like being cool, hey, man, or, you know . . . ."  (Doc. 23-1 at 27.)   Battle later found out what DAN meant.  (*Id.*)  After that, Rakestraw only said DAN to Battle's face one more time.  As Battle explained,

> . . . [T]he one time he did it—and that's when—that's after—that's after the fact that I knew what [DAN] was, what it meant because he did it several times on—on the tank just playing around, but this one time that he did it is when he had got [quality assurance] inspector.
>
> And, so, I was putting on a skirt and we were putting the pin in and then he going to—he going to come by and say, "Hey, DAN, you ain't working—you ain't working fast enough.  You're going to have to get—you're going to have to get this job done."

(Doc. 23-1 at 28.)

Before Battle knew what DAN meant, he could not have subjectively perceived this comment as severe harassment.  In fact, Battle thought it meant he was cool.  (Doc. 23-1 at 27.)  Moreover, Battle's testimony establishes that Rakestraw used this term in a joking manner, rather than a threatening one.  (Doc. 23-1 at 28.)  And, Battle's testimony also confirms that being called DAN never affected his job *before* he knew what it meant.

Battle contends that Rakestraw took pleasure in successfully, but secretly, insulting him to his face.  (Doc. 25 at 42.)  Even if that allegation is true, it does not show that Battle *endured* severe harassment.  Of course, a reasonable person would be angry about Rakestraw's comments after he learned their meaning.  The court assumes that Battle was similarly angry after he learned what DAN meant even though Battle has offered no testimony on this issue.

After Battle learned what DAN meant, Rakestraw called him DAN only one time.  This incident caused a verbal altercation between Battle and Rakestraw.  (Doc. 23-1 at 28)  But it only happened once.  The manner in which Rakestraw said DAN was not threatening.  And, the court cannot conclude that Rakestraw's comment would significantly impede a reasonable person's ability to do Battle's job.  Thus, Rakestraw's single comment does not amount to severe and pervasive harassment.

33

Battle also contends that other employees, including Turner, used the term DAN. (Doc. 23-10 at 119–121; 145.)  And, Battle contends that Morris heard Turner use the N-word.  (Doc. 23-10 at 120.)  However, Battle never heard these comments.  When offensive comments are not directed at an employee and not uttered in his presence, they do not constitute severe and pervasive harassment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986) ("Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII.") (internal quotation marks and citation omitted); *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (finding racial epithets uttered by the plaintiff's superior not severe harassment because the comments were not directed at the plaintiff or in her presence).

Finally, Battle contends that Turner assigned Battle to a room with Swain, an African-American mechanic.  The court assumes that Battle found this decision offensive.  Nonetheless, this was not a severe or threatening act of harassment.  Nor has Battle shown that this decision unreasonably affected his ability to do his job.

Viewing the situation as a whole, Battle has not shown that he endured severe and pervasive harassment because of his race.  At first, Battle did not even know what DAN meant.  When he found out, he complained to both Centeno and Turner.  (Doc.

34

23-1 at 12, 28.) Both men told their employees there would be zero tolerance for racial slurs, especially DAN.  (Doc. 23-1 at 13, 28–29.)  After that, Rakestraw called Battle DAN one time, in a nonthreatening manner.  (Doc. 23-1 at 28.)  Battle never heard other coworkers use the term DAN or any other racial slur.  Finally, Battle's segregated housing had no affect on his job performance.  Thus, the court cannot say that this harassment was severe and pervasive.

Because Battle did not endure severe and pervasive harassment because of his race, the Motion is due to be **GRANTED** on Battle's hostile work environment claim.

## C.    Retaliation

Finally, Battle asserts that the Army retaliated against him for complaining about discrimination.  Title VII prohibits an employer from retaliating against an employee for opposing an unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a).  Even if the employment practice is not actually unlawful, the statute protects the employee so long as he reasonably believes the practice is unlawful.  *See Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).  As with Battle's disparate treatment claim, he offers no direct evidence of retaliation, and instead, relies on the *McDonnell Douglas* burden shifting framework.  "A prima facie case of retaliation under Title VII requires [a] plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and

(3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001)).       T h e standard for an adverse employment action differs sharply from the disparate treatment context.   There, the employee must suffer an action which materially changes the conditions of his employment.   *See Crawford*, 529 F.3d at 970 (11th Cir. 2008).  But, an adverse employment action in the retaliation context means an action which might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Crawford*, 529 F.3d at 974 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006)).

To show a causal connection, an employee must show that the protected conduct and the adverse action were "not wholly unrelated." *Id.* (citation omitted).  "For purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated." *Id.* (internal quotation marks and citation omitted).  However, when a plaintiff relies on temporal proximity alone, the proximity must be "very close."  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (citation omitted). Additionally, the employee must at least show that the decision maker was aware of the protected conduct.  *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir.

36

2000), *overruled on other grounds*, *Burlington*, 548 U.S. at 68, 126 S. Ct. at 2415.

Initially, the court must address the Army's contention that Battle's retaliation claim is not properly before the court.  In his Complaint, Battle contends that the Army retaliated against him "by terminating the Plaintiff."  (Doc. 1 at 6, ¶ 30.)  However, Battle now admits that the Army did not terminate him.  (Doc. 22 at 21, ¶ 96.)  Thus, Battle's retaliation claim, as stated in the Complaint, fails as a matter of law.

Nonetheless, at Battle's deposition, he discussed other acts of retaliation, including his early return from Iraq and his suspension.  Any claim based on these allegedly retaliatory acts are not properly before the court.  Federal Rule of Civil Procedure 8(a) requires a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Under Eleventh Circuit precedent, an act of retaliation is not properly before the court unless that act is mentioned in the complaint.  *See Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006).

In *Brown v. Snow*, the plaintiff alleged two acts of retaliation.  One occurred before the plaintiff filed his complaint; the other after he filed his complaint.  Even though the plaintiff discussed the second act at his deposition, he never amended his complaint to include the second act of retaliation.  The Eleventh Circuit held that this act of retaliation was not properly before the district court because it was not in the plaintiff's complaint.  *Brown*, 440 F.3d at 1266.

Moreover, the Eleventh Circuit has clearly said that the complaint controls the claims before the court. *See Flintlock Const. Serv., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1226–28 (11th Cir. 2013). To properly present new or different claims at the summary judgment stage, a plaintiff must seek leave to amend his complaint under Rule 15(a). *Id.* at 1228.

Here, the Complaint only mentions Battle's termination. (Doc. 1 at 6.) Battle fails to mention any other retaliatory acts. Thus, any claim based on other allegedly retaliatory acts are not properly before the court. *See Brown*, 440 F.3d at 1266. Further, unlike *Brown* where the retaliation occurred after the filing of the complaint, the alleged retaliation in this case occurred well before Battle filed his Complaint. Therefore, Battle surely had the opportunity to identify these other acts in his Complaint. For whatever reason, he limited his retaliation claim to his termination. Finally, Battle has not moved to amend his Complaint under Rule 15. Thus, the Motion is due to be **GRANTED** on Battle's retaliation claim.

Independently and alternatively, Battle's retaliation claim fails on the merits. Here, Battle contends the Army retaliated against him in four ways: (1) putting him in segregated housing; (2) reprimanding him for not working hard, talking on a cell phone, and for going in Centeno's office to get coffee; (3) being sent home early; (4) and being suspended without pay. (Doc. 25 at 36.)

To decide whether Battle can establish a prima facie case of retaliation regarding these four actions, the court must determine when Battle first complained of discrimination. Not surprisingly, the parties dispute this fact. Battle contends that he first complained to Centeno shortly after arriving in Iraq. (Doc. 25 at 16, ¶ 147; Doc. 25 at 37.) To support this contention, Battles cites his deposition. (Doc. 23-1 at 13) But upon closer inspection, Battle's deposition testimony does not clearly establish when his meeting with Centeno occurred. In fact, it appears that, at the testimony cited, Battle was talking about when the discrimination started, not when the meeting occurred.[16] And, Battle later testified that his first meeting with Centeno occurred in February, rather than shortly after his arrival. (*See* Doc. 23-1 at 12–14.)        T h e Army contends that Battle first complained to Centeno on February 6, 2008, after

---

[16] Battle testified as follows:

Q:    At the first meeting [with Centeno], I think, as you were describing it a moment ago, you were voicing your complaints about what you believed to be racial discrimination?

A:    Right.

Q:    And do you know when that occurred?

A:    I don't know the exact time frame, but I know it was soon as we got over there, over to Iraq. It really didn't start at Kuwait, it started after we left Kuwait and landed into Iraq, Baghdad. And when we started getting our [rooms] and when we started separating—separating people to bunks. Automatically I seen separation then.

(Doc. 23-1 at 13.)

Turner had counseled him about his work performance. (Doc. 22 at 46.) The record supports only the Army's version of events.[17]

It is undisputed that Turner counseled Battle about his work performance on February 6, 2008. (Doc. 23-2 at 5.) An email from Centeno shows that Battle mentioned Turner's counseling in their meeting. (Doc. 23-18 at 22.) Additionally, it is undisputed that Battle arrived in Iraq on January 21, 2008. (Doc. 22 at 7, ¶ 9.) Yet, Battle clearly testified that his meeting with Centeno took place in February 2008, many days after he arrived.[18] (Doc. 23-1 at 14.) And, Battle later testified that he discussed the racial slur DAN at their meeting. (Doc. 23-1 at 43.) However, Battle did not learn what DAN meant until well after he arrived in Iraq. Based on its thorough review of the record, and for the reasons stated above, the court finds that Battle did not complain about discrimination before February 6, 2008.

Having established when Battle first complained, the court can easily dismiss Battle's retaliation claim regarding his segregated housing and his reprimand. First, the decision about Battle's roommate was made long before Battle complained. Thus,

---

[17] The record does contain some factual inconsistencies. For example, Battle testified that he had two meetings with Centeno whereas Centeno mentions only one meeting with Battle. Similarly, Battle testified he met Centeno in his office, while Centeno testified they met in his personal living quarters. These discrepancies are not material because Battle has proffered no evidence from which a reasonable jury could find that he complained before February 6, 2008.

[18] This fact lends further credence to the court's interpretation of Battle's deposition.

Battle's cannot establish a causal connection. Similarly, Battle's complaint to Centeno came after his reprimand by Turner. Thus, Battle cannot show a causal connection.

And, even if Battle could establish a causal connection between his reprimand and his complaints about discrimination, the Army had a legitimate, nondiscriminatory reason to reprimand Battle—namely, Centeno's complaints about Battle's work performance. (Doc. 23-5 at 2, ¶ 10; *see* Section III.A.3 *supra*.) Additionally, Centeno had already talked to Turner about Battle's work before Battle ever came to him about Turner's alleged discrimination. (Doc. 23-18 at 22.) An employee who is "already on thin ice [cannot] insulate [himself] against . . . discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010). Centeno's complaint about Battle's work is a legitimate, nondiscriminatory reason for Battle's reprimand. Battle has not shown otherwise.

However, Battle has a prima facie case regarding his return home and his suspension. Both actions might dissuade a reasonable employee from making a charge of discrimination. Further, Battle's return home occurred shortly after his complaint. And, while Battle's suspension occurred several months later, it resulted from Battle's deployment. Thus, the court cannot conclude that these actions are wholly unrelated to Battle's complaint.

Nonetheless, the Army had legitimate, nondiscriminatory reasons for these

decisions. As discussed in Section III.A.3 *supra*, Carlisle brought Battle home early because of complaints from Centeno.  (Doc. 23-8 at 7, ¶ 25; Doc. 22 at 11, ¶ 37; Doc. 23-8 at 7, ¶ 25; Doc. 23-11 at 7–8; Doc. 23-5 at 2, ¶ 6–11).  Battle admits that Centeno never discriminated against him, (Doc. 22 at 12, ¶ 38; Doc. 23-1 at 12–13), and Battle has identified no white employees that Centeno complained about and who were not sent home early from Iraq, (Doc. 34 at 6, ¶ 11).  Thus, Battle cannot show pretext.

Similarly, Michael Burke made the decision to suspended Battle.  Battle contends that Burke based his decision only on information ultimately received from Turner.  However, there is no genuine dispute that Burke based his decision on Battle's adverse action file.  More important, this file provides ample, independent support for the Army's decision to suspend Battle. *See* Section III.A.4 *supra*.

For these independent and alternate reasons, the Motion is due to be **GRANTED** on Battle's retaliation claims.

## IV.   CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact and the Army is entitled to Summary Judgment as a matter of law.  Accordingly, the Motion is due to be **GRANTED**.  Battle's claims are hereby **DISMISSED WITH PREJUDICE**.  The court will enter a separate final judgment.

**DONE** and **ORDERED** this the 14th day of June, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge